Sealed

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: _16-24546 CV WMH_

MARJAN MAZZA, on behalf of the
UNITED STATES OF AMERICA,

      Plaintiff/Relator

                                        **FILED UNDER SEAL**
                                        **JURY TRIAL DEMANDED**

VS.

MIAMI-DADE COUNTY,
MIAMI-DADE TRANSIT DEPARTMENT,

      Defendants.

## QUI TAM COMPLAINT

RELATOR, MARJAN MAZZA, by and through the undersigned counsel, Josephs Jack, brings this qui tam action pursuant to 31 U.S.C. § 3729, *et seq.,* as amended (the False Claims Act), in the name of the United States Government, to recover all damages and penalties arising from false claims for money submitted to the United States Government, and in her own name to obtain the relief needed to make her whole from the damages she suffered from violations of 31 U.S.C. § 3730 (h).

### INTRODUCTION

1.      31 U.S.C. § 3729, *et seq.,* as amended (the False Claims Act), provides, *inter alia,* any person who knowingly presents a false or fraudulent claim for payment is liable for a civil penalty of up to $11,000.00 for each claim, plus three times the amount of the damages sustained by the Government. The False Claims Act allows any person who discovers a fraud perpetrated against the Government to bring an action on her own behalf and for that of the

Government and to share, as permitted by law, in the recovery. This Complaint is an action pursuant to the Federal False Claims Act and is filed under seal for sixty (60) days without service on the Defendant (for the sixty (60) day period) so as to enable the Government to (1) conduct its own investigation without the defendant's knowledge; and (2) determine whether to join in the action.

2.     Plaintiff/Relator, MARJAN MAZZA, graduated Embry Riddle Aeronautical University in 1992 with a Masters in Aviation Business Administration. She began working at the Miami-Dade County Aviation Department as an Aviation Specialist in 1989 in the Planning and Development Division. She was later promoted to Administrative Officer within the department. After five years, she went to work for the Broward County Aviation Department as an Airport Manager in charge of the Grants & Passenger Facility Charge (PFC) Administration. She was then promoted to assistant to the aviation department director, expanding her areas of responsibilities to legislation and becoming the department's Federal and State liaison. In 2001, she went to work at Miami Dade College as the Chairman of the Eig-Watson School of Aviation. In 2007, she began work as the Regional Federal Program Analysis Officer for the United States Department of Transportation, Federal Aviation Administration (FAA) Great Lakes Region.

3.     She has accumulated over twenty years of experience in government work, including employment with Broward County Aviation Department, Miami-Dade County Aviation Department and the Federal Aviation Administration. Her work was focused on the area of applying, securing and administering federal grants. Honors include a proclamation by the Broward County Board of Commissioners designating November 4, 1998 as Marjan Mazza appreciation day.

2

4.      Hired in June of 2009 by the Miami-Dade Transit Department, she was fired after only a year and a half of service when she refused to be complicit in the commission of a fraud on the United States Government.

## JURISDICTION AND VENUE

5.      This action arises under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

6.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

7.      Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1391 (b) and 1391(c), and under 31 U.S.C. 3732(a) because the Defendants herein can be found, reside, transact and/or transacted business within the judicial district. Additionally, the acts which are the subject matter of this complaint occurred within this Court's district.

## PARTIES AND PRINCIPAL PARTICIPANTS

8.      Plaintiff/Relator, MARJAN MAZZA (hereinafter "MAZZA"), is a citizen of the United States, residing in Broward County, located within the Southern District of Florida. Until November 2010, she was employed by Defendant, MIAMI-DADE TRANSIT DEPARTMENT.

9.      Defendant, MIAMI-DADE COUNTY (hereinafter "THE COUNTY"), is a political subdivision and municipal organization within the State of Florida and the government of the citizens of Miami-Dade County.

10.      Defendant, MIAMI-DADE TRANSIT DEPARTMENT (hereinafter "MDT"), is a local special-purpose governmental entity located in Miami-Dade County, servicing THE COUNTY through its offices located at 701 NW First Court, 17th Floor, Miami, FL 33136.  MDT provides

services to THE COUNTY including, but not limited to, the delivery of public transit services via four transportation modes: Metrobus, Metrorail, Metromover and Paratransit.

11.     At all times material hereto, MDT, by and through its employees, agents, representatives, directors and/or managers, acted as an agent and/or representative of THE COUNTY.

12.     George Burgess (hereinafter "BURGESS") is a citizen and resident of the United States and at all times material hereto, was an employee and agent of Miami-Dade County serving as County Manager to Miami-Dade County. Mr. Burgess had knowledge of the complained of wrong doings at the time they occurred. Upon discovering that Relator, MAZZA, was disclosing the improprieties set forth hereinafter to Ysela Llort, Jennifer Glazer-Moon, as well as to FTA Auditors and the Office of Inspector General, BURGESS allowed the firing of MAZZA in order to allow KAPOOR to shift blame and attempt to discredit MAZZA. His disclosures to the Board of County Commissioners have been less than candid.

13.     Ysela Llort (hereinafter "LLORT") is a citizen and resident of the United States and was employed as Assistant County Manager to Miami-Dade. She had oversight of the Miami Dade Transit Department and at all times material hereto, had full knowledge of the improprieties set forth below.

14.     Jennifer Glazer-Moon (hereinafter "GLAZER-MOON") is a citizen and resident of the United States and was employed as Director for the Office of Strategic Business Management for Miami-Dade County with budget oversight over MDT. GLAZER-MOON had full knowledge of the improprieties as set forth below.

4

15.     Grace Cespedes (hereinafter "CESPEDES") is a citizen and resident of the United States serving as Deputy County Finance Director for Miami-Dade County.  The plaintiff and her staff spoke to Ms. Cespedes on numerous occasions regarding the problems at transit (described hereinafter) to no avail.

16.     Harpal Kapoor (hereinafter "KAPOOR") is a citizen and resident of the United States serving as Director of Miami-Dade Transit for Miami Dade County. At all times material hereto, KAPOOR had knowledge of the MDT improprieties. He orchestrated the scheme that caused the misappropriation complained of herein and later sought to prevent the discovery of same.  KAPOOR ignored responsibilities to the Federal Government and certified, as the Director of MDT, the necessary Certifications and Assurances to the FTA to obtain federal funds knowing full well the Certifications and Assurances were false representations.    In the course of his nefarious activities, KAPOOR routinely harassed and intimidated Relator and any others who questioned his actions and that of the department.

17.     Hugh Chen (hereinafter "CHEN") is a citizen and resident of the United States and serving as Miami-Dade Transit Deputy Director of Operations for Miami Dade County. At all times material, CHEN was responsible for all purchasing and maintenance contracts within MDT. CHEN had oversight responsibilities for bus, rail and mover departments and their respective budgets. He was a willing and knowing participate in the wrongful activities of KAPOOR. CHEN steadfastly refused to correct the wrongdoings pertaining to the improper drawdowns of Federal funds each time the lack of Federalized Contracts was brought to his attention.

18.     Ryan Elliot (hereinafter "ELLIOT") is a citizen and resident of the United States and served as Budget Analyst for the Miami-Dade County's Office of Strategic Business

5

Management. When advised of the issues with the fare collection system and revenue/ridership reports, he chose to take deliberate actions in an attempt to conceal the wrongdoings.

## FACTUAL ALLEGATIONS

19.     Relator, MAZZA, is an "original source" (as defined in 31 U.S.C. § 3730(e)(4)(B)) of the information on which the allegations contained herein are based.

### The Federal Transit Administration

20.     The Federal Transit Administration (the "FTA") is an administration existing within the United States Department of Transportation, whose function is to assist transit agencies and departments in the 50 states.

21.     More particularly, and pertinent to this matter, the United States Federal Government, through the FTA, provides financial assistance to develop new transit systems and improve, maintain and operate existing transit systems by overseeing thousands of grants to hundreds of State and local transit providers (such as Miami-Dade County and the Miami-Dade Transit) primarily through the FTA's regional and metropolitan offices. The FTA provides formula and discretionary funding under a variety of programs by awarding grants to eligible recipients.

22.     As more fully set forth below, grantees (e.g. THE COUNTY and MDT) are responsible for managing their own programs in strict compliance with Federal statutory and administrative requirements.[1]

23.     The Federal Transit Act, as amended, directs the FTA to rely on individual grantee certifications of compliance with the many FTA requirements. It is, in essence, an honor system.

---

[1] Most Federal transit laws are codified at 49 U.S.C. § 5301 *et seq.*

6

24.     FTA grants are processed as reimburseable payments for costs which must be documented and certified in order to receive federal funds.

25.     In order to receive FTA-assisted federal funds, each applicant must submit a series of certifications and assurances which include, but are not limited to:

a) Certifications & Assurances for Urbanized Area Formula Program and Job Access and Reverse Commute ;

b) Certifications & Assurances for Elderly and Persons with Disabilities Program;

c) Interest or Other Financing Costs;

d) Procurement Compliance;

e) Standard Assurances; and

f) Disadvantaged Business Enterprise.

26.     All federal funds paid out require a certification, express and/or implied, that the Grantee has ensured all Federal laws and regulations are being complied with.

## OVERVIEW OF DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT

27.     Defendants, THE COUNTY and MDT, through their agents, employees, directors, managers and/or supervisors, have violated the False Claims Act by knowingly perpetrating and participating in, and/or conspiring with others participating in, a scheme and/or various schemes to defraud the United States Government over a substantial period of time.

28.     As more fully set forth below, Defendants, THE COUNTY and MDT, applied to the FTA for authority to receive federal funds pursuant to several FTA Grants.

29.     Upon applying for and/or some time after receiving authority from the FTA to use Federal funds, Defendants, THE COUNTY and MDT, engaged in a concerted plan aimed at

7

wrongfully procuring hundreds of millions of dollars from the United States, and then misusing and grossly misappropriating the FTA Grant funds so obtained.

30.     This scheme continued over the course of several years and involved hundreds of millions of dollars.

31.     More particularly, once the FTA Grant Funds were awarded, Defendants repeatedly drew down from those FTA Grant Funds to pay for expenses, salaries, contracts and costs that were knowingly violative of the applicable federal laws and administrative rules.

32.     Indeed, MDT routinely and systematically utilized federal funds whenever there was a shortage in the operating budget.

33.     In an effort to conceal this wrongdoing, Defendants then engaged in a pattern of conduct aimed at preventing the agencies involved from detecting the impropriety.

<u>FTA ASSISTANCE PROGRAMS AT ISSUE</u>

34.     The FTA has several major assistance programs for eligible activities. Funds for these activities are provided through legislative formulas or discretionary authority and provided on an 80/20 Federal/Local funding match basis.[2]

35.     The FTA Grant Funds which Defendants misappropriated include, but are not limited to:

      a) 49 U.S.C. § 5307;

      b) 49 U.S.C. § 5309; and

      c) 49 U.S.C. § 5310.

---

[2] Unless otherwise specified by legislation.

36.     49 U.S.C. § 5307 (hereinafter "Section 5307") is the Urbanized Area Formula Grant Program. This Program makes Federal funds available for transit planning, capital and operating assistance in urbanized areas relating to bussing services.

37.     49 U.S.C. § 5309 (hereinafter "Section 5309") is the Capital Investment Grant Program. These Grants fund three different programs:

a) fixed guideway modernization in areas with populations over 200,000 with fixed guideway segments at least seven years old (based on a formula);

b) construction and extension of new fixed guideway systems (New Starts, Small Starts, and Very Small Starts Programs); and

c) purchase of bus and bus related equipment and facilities in both urbanized and nonurbanized areas (Bus and Bus Facility Program).

38.     49 U.S.C. § 5310 (hereinafter "Section 5310") is the Elderly Individuals and Individuals with Disabilities Grant Program. This Program makes Federal funds available for transportation services planned, designed and carried out to meet the special transportation needs of elderly individuals and individuals with disabilities.

39.     Since 1996, THE COUNTY, through MDT, applied for and received authority to utilize the FTA's Grants under 49 U.S.C. §§ 5307 and 5309.

40.     On information and belief, the amount of funds applied for and received by THE COUNTY and MDT under 49 U.S.C. §§ 5307 and 5309 exceeds $412,000,000.00.

41.     As a recipient of these FTA Federal Grants, Defendants, THE COUNTY and MDT, were required to certify and assure that all Federal statutory and administrative requirements were strictly adhered to.

42.     From 2004 through 2009, MDT engaged in a scheme to defraud the Federal Government; certifying and assuring to the Federal Government that the funds were being utilized properly despite direct knowledge to the contrary.

## VIOLATION OF THE FALSE CLAIMS ACT 1:
## MDT USES FEDERAL FUNDS FOR NON-FEDERALIZED CONTRACTS

43.     Contracts and/or Agreements entered into by the MDT and third parties, which will be paid for by federal funds such as those discussed above, must be "Federalized" (i.e. they must specifically contain certain language and provisions set forth by Federal law and regulations).

44.     The clauses and/or language required in the contracts include, but are not limited to, "Buy America" language and "Davis-Bacon Act" language.

45.     Generally, federal grant funds provided by the FTA may not be used to pay for the purchase of manufactured products which are not produced in the United States. Contracts must include this "Buy America" language.

46.     The "Buy America Requirements" require THE COUNTY and MDT to ensure, verify and certify to the FTA that all federal funds will be used, are being used and have been used to purchase American produced goods.

a)  "Except as provided in 661.7 and 661.11 . . . no funds may be obligated by FTA for a grantee project unless all iron, steel, and manufactured products used in the project are produced in the United States." 49 C.F.R. § 661.5(a).

b)  "For a manufactured product to be considered produced in the United States: (1) All of the manufacturing processes for the product must take place in the United States; and (2) All of the components of the product must be of U.S. origin. A component is considered of U.S. origin if it is manufactured in the United States, regardless of the origin of its subcomponents." 49 C.F.R. § 661.5(d).

10

c)  49 U.S.C. § 5323 (j)(1) governs chapter 53 generally and similarly states, that federal funds may only be appropriated to carry out this chapter for a project only if the steel, iron, and manufactured goods used in the project are produced in the United States.

d)  49 U.S.C. §§ 5307(d)(1)(E)(iii) states a recipient may receive a grant *only if*, "in carrying out a procurement under this section – will comply with applicable Buy America laws in carrying out a procurement."

e)  49 C.F.R. § 661.13 requires a Grantee (e.g. THE COUNTY and MDT) to obtain, as a condition of responsiveness to any bid or offer obtained for a contract with a third party, a completed Buy America certificate.

47.      Additionally, contracts must contain a clause that no laborer or mechanic employed directly upon the site of the work shall receive less than the prevailing wage rates as determined by the Secretary of Labor. This is often referred to as "Davis-Bacon Act" language.

48.      Despite these federal laws and regulations, MDT entered into a multitude of contracts and agreements with various bidders and/or offerors using contract formats which failed to contain the requisite Buy-America language or the Davis-Bacon Act language.

49.      Despite having knowledge that the contracts and/or agreements did not comply with Federal statutory and administrative rules, MDT drew from federal grant funds provided by the FTA to the MDT pursuant to 49 U.S.C. §§ 5307 and 5309 and applied those funds to the non-Federalized contracts and/or agreements.

50.      From 2007 to 2009, over 95% of the contracts which were represented to the Federal Government as federalized contracts for purposes of applying for federal funds did not contain the necessary federal language.

51.      MDT represented and/or certified to the FTA that the funds were being properly administered in accordance with the laws of the United States.

11

52.     MDT's application for funds for non-Federalized Contracts and/or Agreements was a false claim which violated the False Claims Act.

53.     From 2004 through 2009, MDT engaged in a systematic scheme to evade the assurance program as MDT excluded mandatory federal provisions in the contracts, yet continued to use federal funds for their payment.

54.     Over $100,000,000.00 was utilized by the MDT from 2004 through 2009 for non-federalized Contracts and/or Agreements.

55.     Federal funds were utilized by MDT prior to 2004 (and as early as 1996) for non-federalized Contracts and/or Agreements.

## VIOLATION OF THE FALSE CLAIMS ACT 2:
## MDT IMPROPERLY USES FEDERAL FUNDS TO PAY SALARIES
## (FORCE ACCOUNTS)

56.     Federal funds provided pursuant to Sections 5307 and 5309 may only be utilized to pay for "preventive maintenance," (i.e. maintenance costs related to vehicles and non-vehicles.) More specifically, preventive maintenance is defined as all the activities, supplies, materials, labor, services and associated costs required to preserve or extend the functionality and serviceability of the asset in a cost effective manner, up to and including the current state of the art for maintaining such an asset.

57.     A Grantee (e.g. THE COUNTY and MDT) may not utilize federal funds for salaries of the Grantee's own labor forces except in four limited conditions:

      a)  When it will create cost savings;

      b)  When the Grantee has exclusive expertise;

      c)  To promote the safety and efficiency of operations; and

d) As required by a union agreement.

58.　　When one of these conditions is met, a grantee's own labor force may be utilized to carry out a capital grant project.

59.　　With regards to the preventive maintenance grants (such as Section 5307 and 5309), the labor is limited to labor directly related to those activities authorized by the grant. Only that labor authorized under the grant may be paid (and then only 80% may be paid for by the federal government).

60.　　At all times material hereto, MDT was required by Federal law and regulations to maintain a Force Account Plan if it was to use federal funds for salaries of MDT employees.

61.　　To be eligible for reimbursement for force account work, a grantee must provide the following before incurring costs:

a) The justification for using grantee forces;

b) Preparation and establishment of a force account plan;

c) A description of the Scope of Work; and

d) A detailed estimate of costs, schedule and budget.

62.　　Reimbursement of expenses associated with a force account is based upon actual expenses and labor spent on the eligible work project.

63.　　At all times material hereto, MDT was required to maintain timesheets to substantiate the force account work which was performed and paid for with federal funds with the goal of accurately allocating specific personnel costs to specific cost accounts.

64.　　From 2003 through 2009, MDT failed to have a Force Account Plan implemented.

13

65.     From 2003 through 2009, MDT failed to properly create and/or maintain timesheets to substantiate the work allegedly performed and paid for with federal funds.

66.     General practice requires a certification by an MDT force account of those cost accounts, however, MDT willfully ignored this obligation and failed to establish any force accounts.

67.     Without any certification process in place, MDT could not verify that the draw of the funds was legitimately used for salaries of individuals working solely on the grant funded programs. In 2006, MDT initiated a certification process, however, failed to create a Force account.

68.     These deficiencies made it virtually impossible for MDT to certify to the FTA that all hours billed were substantiated.

69.     Despite knowing that there were no timesheets or other documentation to substantiate the projects and specifically allocate the costs (who worked the project, what they did and how many hours they worked), MDT, its employees, officers and directors, drew from federal funds granted pursuant to §§ 5307 and 5309 to pay for salaries of employees.

70.     To draw these funds, MDT certified to the FTA that all procedures and laws of the FTA were properly in place and adhered to and that the salaries paid were verified as direct costs and supported by documentation.

71.     With no Work Force Plan (Force Account) in place from 2003 – 2009, all funds drawn from federally funded grants §§ 5307 and 5309 were improper and a violation of the False Claims Act.

72.     With no timesheets or other documentation to substantiate the force account work that was purportedly performed from 2003 – 2009, federal funds drawn during that time were improperly utilized. With no time sheets in place from 2003 – 2009, all funds drawn from federally funded grants §§ 5307 and 5309 were improper.

73.     The FTA requires, pursuant to Federal law and regulations, as a condition for payment of federal funds, a Grantee's certification and assurance that all funds are properly administered pursuant to Federal laws and regulations to eligible recipients.

74.     MDT was required to certify the federally procured funds were being utilized in compliance with Federal laws and regulations as a condition of receiving federal funds and that MDT was performing all obligations required under those laws and regulations, including, but not limited to, the rules associated with the specific grants.

75.     MDT certified and assured to the FTA that the funds MDT was utilizing were being properly expended in accordance with the laws and regulations of the Federal government and FTA.

76.     Federal funds were utilized during this time period to pay for salaries not authorized by the Federal government despite representations to the contrary.

77.     In point of fact, the uncertified funds were utilized to offset MDT's operating costs.

78.     In excess of $50 million of federal funds were thus being applied to ineligible costs on an annual basis.

79.     These certifications and assurances, both implied and express, were improper and violated the False Claims Act.

## VIOLATION OF THE FALSE CLAIMS ACT 3:
## MDT IMPROPERLY USES UAP

80.     MDT requires offerors and bidders on MDT contracts to be members of the Miami-Dade County User Access Program (UAP).

81.     Non-County municipalities/agencies that wish to be eligible to bid on MDT Contracts must complete the Miami-Dade County Joint Purchase and Entity Revenue Sharing Agreement. Additionally, the entity must be approved for participation by the Department of Procurement Management (DPM) as a prerequisite for eligibility to access County contracts and the corresponding County contract pricing, terms and conditions.

82.     Further, THE COUNTY'S UAP allows for a two percent (2%) discount on prices, collected through a deduction on vendor invoices for newly established contracts, negotiated modifications of existing contracts, including renewals.

83.     Revenue generated from the UAP program funds the operations of Miami-Dade County's Department of Procurement Management. In other words, the program ostensibly funds THE COUNTY'S operational costs of entering into contracts.  In reality, the funds are used for other matters frequently wholly unrelated to transit.

84.     Federal law and regulations prohibit a Grantee (e.g. THE COUNTY and MDT) from utilizing a User Access Program for contracts which will be funded using federal grants.

85.     The use of a local preference, such as the UAP, contravenes *The Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments*, 49 CFR, Part 18. The Federal regulation states, in relevant part:

> a) "All procurement transactions will be conducted in a manner providing full and open competition consistent with the standards of §18.36" 49 CFR, 18.16(c)(1)

b) "Grantees and subgrantees will conduct procurements in a manner that prohibits the use of statutorily or administratively imposed in-State or local geographical preferences in the evaluation of bids or proposals, except in those cases where applicable Federal statutes expressly mandate or encourage geographic preference."  49 CFR, 18.16(c)(2)

86.     The purpose of the Federal regulation is to promote competition.  MDT's use of the UAP restricts competition to those who are able to participate in the UAP.

87.     In 2004, the FTA informed MDT that the use of UAP's in contracts utilizing FTA-assisted procurements violated Federal law and regulations.

88.     Ignoring federal law, MDT continued to certify and represent to the FTA that it was in conformance with all Federal standards and submitted claims to the FTA to pay for contracts which were granted per a UAP and contained the 2% UAP fee.

89.     THE COUNTY and MDT intentionally, improperly and illegally engaged in a practice of granting contracts in violation of the federal laws and regulations. It did so for financial gain.

90.     Virtually _every_ Contract and/or Agreement which MDT drew from federal funds designated pursuant to §§ 5307 and 5309 contained the 2% UAP fee.

91.     The FTA requires, pursuant to Federal law and regulations, as a condition for payment of federal funds, a Grantee's certification and assurance that all funds are properly administered pursuant to Federal laws and regulations to eligible recipients.

92.     MDT was required to certify the federally procured funds were being utilized in compliance with Federal laws and regulations as a condition of receiving federal funds.

17

93.     MDT certified and assured to the FTA that the funds MDT was utilizing were being properly expended in accordance with the laws and regulations of the Federal government and FTA.

94.     These certifications and assurances, both implied and express, were improper and violated the False Claims Act.

VIOLATION OF THE FALSE CLAIMS ACT 4:<br>MDT'S IMPROPER DRAWS FOR STS UAP's

95.     Since 1976, MDT has entered into Contracts and/or Agreements for Special Transportation Service ("STS").

96.     STS is MDT's Paratransit service transporting eligible customers to medical appointments, school, work, shopping, business, or recreation.

97.     Upon MDT's decision to utilize federal funds for STS services, MDT must ensure that the Contracts comply with Federal laws and regulations.

98.     MDT applied for and drew from federally granted funds to pay for approximately $200,000.00 of costs associated with STS Contracts despite knowledge that these STS Contracts were non-federalized.

99.     Indeed, NO Contract for STS services entered into by MDT is federalized.

100.    MDT knowingly applied federally granted funds to non-federalized contracts.

101.    MDT represented and/or certified to the FTA that the federal funds were being properly administered in accordance with the laws of the United States.

102.    MDT's application for funds for non-Federalized Contracts and/or Agreements was a false claim which violated the False Claims Act.

103.    From 2004 through 2009, MDT engaged in a systematic scheme to evade the assurance program and excluded mandatory federal provisions in contracts.

104.    More than $200,000.00 was utilized by the MDT from 2004 through 2009 for non-federalized STS Contracts.

"THE COVER-UP"
FURTHER EVIDENCE OF WRONGDOING BY MDT

105.    In 2009, DOT conducted an improper payment audit and discovered that several 2007 contracts failed to contain the mandatory federal language.

106.    Shortly thereafter, the FTA required MDT to perform an internal review of all contracts and report to the FTA how many other contracts and associated federally granted funds did not contain with the mandatory federal language.

107.    MDT allegedly performed a review and reported that four contracts did not contain the proper language; the total amount of $845,930.00 for these four contracts was returned to the FTA.

108.    MDT, through its managers, directors, supervisors and employees, deliberately engaged in a scheme intended to deceive and mislead the FTA as to the full extent of the amount of contractual failures concerning the mandatory language.

109.    In actuality, approximately 95% of the federally funded contracts that MDT entered into lacked the mandatory language.

110.    In 2010, the Federal government conducted an audit of the 2008 contracts and uncovered additional contracts lacking the mandatory Federal language.

111.    In an effort to avoid detection of the heretofore described wrongdoing, Defendants have engaged in a practice of dismantling internal controls, falsifying reports,

19

tailoring accounting reports, giving less than candid responses to federal officials investigating the matter and threatening the livelihood of any employee who refused to support and/or otherwise participate in the wrongdoing and the concerted effort aimed at avoiding detection including, but not limited to, Relator, MAZZA.

112.    On or around September 2010, KAPOOR, in advance of an upcoming FTA Financial Management Oversight Audit, and as part of his scheme to avoid detection of the improper use of Federal funds resulting from the Force account deficiencies, repeatedly and forcefully attempted to pressure and harass Plaintiff and other employees, supervisors, managers and directors of MDT to generate fraudulent detailed time-sheets for expenses arising under contracts dating back to 2003.

113.    On or about September 29, 2010, KAPOOR informed all attending a senior staff meeting of their need to "rehearse" for the upcoming meeting with the FTA's Financial Management Oversight Program ("FMO").

114.    At a later meeting that same day, KAPOOR advised the staff of the need to come up with "revised" numbers for previous fiscal years regarding preventative maintenance grants reimbursement.

115.    This "rehearsal" and demand for "revised" numbers was part of the continued program aimed at hiding the improper conduct of Kapoor and the impermissible drawdown of Federal funds over which he had presided and orchestrated.

116.    On or about September 30, 2010, KAPOOR and CHEN demanded Plaintiff provide FTA auditors with false statements regarding previous years' federal grant draw downs and to

retroactively generate "time-sheets" to FY 2003 and asked the defendant to provide the FTA FMO with the retroactively generated time sheets.

117.    Relator, MAZZA's, objections to these demands was met with acts aimed at intimidating and harassing Relator including threats MAZZA would lose her job and be blamed for the improper drawdown of funds should it be detected.

118.    On October 1, 2010, Relator voiced concerns to GLAZER-MOON (Executive Director of OSBM) regarding the failings of the MDT insofar as internal controls relating to ridership reporting, fare box collections and revenue reconciliation as well as the fragmentation of financial controls for the kiosk, easy card and other practices, all of which MAZZA was concerned might lead to censure by the FTA, and the facilitation of fraud and theft.  Relator, MAZZA, also made it known to GLAZER-MOON that the executive staff of the MDT were isolating her, treating her in a demeaning manner, harassing her in a threatening manner and otherwise making her work life miserable and unbearable.  GLAZER-MOON advised Relator, MAZZA, to file an EEO complaint.

119.    On October 4, 2010, Relator, MAZZA, spoke with YSELLA LLORT, the Assistant County Manager for THE COUNTY. MAZZA informed LLORT of the gross and purposeful mismanagement of funds by MDT and its managers, supervisors and directors.

120.    LLORT referred MAZZA to KATHY JACKSON (Auditor for THE COUNTY). Relator, MAZZA, provided JACKSON with numerous documentation evidencing the mismanagement of fare collection by MDT and its supervisors, directors and employees.  No relief was provided. Nothing was done.

121.    On or about October 29, 2010, KAPOOR and CHEN contacted the FTA, including the FMO Auditor and regional staff and, with knowledge and intent to deceive the Federal Government, represented that the reconciliation of Fare Box revenues was entirely under the control of the Finance Division of the MDT.

122.    In reality, the function resides with a separately established revenue reporting section called "Performance Reporting".

123.    On November 23, 2010, Relator, MAZZA, was fired without any explanation.

124.    On or about December 7, 2010, George Burgess (the County Manager), LLORT, and KAPOOR appeared before the Board of County Commissioners and falsely stated that the suspension of FTA funds had resulted from accounting errors and that those responsible had been removed for not involving the County's staff in the audit and the FTA FMO auditors' preliminary findings could have been avoided as no actual audit report has been provided.

### Count I – False Claims Act Violations

125.    Relator, MAZZA, hereby incorporates and realleges Paragraphs 1 - 124 as if fully set forth herein

126.    At all times material hereto, Defendant MDT was, and/or is, the agent and/or representative of MDT.

127.    By engaging in the scheme of acts set forth above, Defendants, by and through their respective agents, officers, representatives and employees, in violation of the False Claims Act, 31 U.S.C. §§ 3729, et seq., (i) knowingly presented or caused to be presented to an officer or employee of the United States Government numerous false or fraudulent claims for payment or approval, (ii) knowingly made, used or caused to be made or used, false records or statements to

22

get a false or fraudulent claim paid or approved by the United States Government; (iii) conspired to defraud the United States Government by getting a false or fraudulent claim allowed or paid; and/or committed other violations listed in the False Claims Act set forth in § 3729(a)(1) (A)-(G).

128.      The supervisors, managers and/or directors of THE COUNTY and MDT were alter-egos controlling MDT for its improper personal use and were therefore "de facto" employers of Relator, MAZZA.

129.      The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.

130.      As direct consequence of the acts and violations described above, the United States is entitled to treble damages based upon the amount of damage sustained by the United States due to Defendants' acts and violations.

131.      Relator, MAZZA, is entitled to reasonable attorneys' fees and costs pursuant to 31 U.S.C. § 3730 (d).

## Count II – False Claims Act Retaliation Violation

132.      Relator, MAZZA, hereby incorporates and realleges Paragraphs 1 - 131 as if fully set forth herein

133.      The Defendant supervisors, managers and/or directors of THE COUNTY and MDT were alter-egos controlling the MDT for their/its improper personal use and were therefore "de facto" employers of Relator, MAZZA.

134.      Relator, MAZZA, was discriminated, harassed, threatened, conspired against and discharged from her employment by her employer, Defendant, MDT, and through the acts of its officers, agents, employees, de facto employees and Defendants as a direct result of lawful

actions taken by MAZZA in furtherance of an action, possible action, and/or investigation premised upon violations which might serve as a basis of an action under the False Claims Act. These actions taken by MAZZA included, but were not limited to, reporting of the False Claims Act violations to the Office of Inspector General and her participation in the investigation of those violations by law enforcement officials and her investigation into the actions of one or more defendants that are actionable under the False Claims Act.

135.    The actions of Defendant, MDT, and/or its supervisors, managers, directors, de facto employees, and THE COUNTY,  as set forth above, violated 31 U.S.C. § 3730 (h) and caused damages to Relator, MAZZA.

136.    As alleged above, Defendants and others harassed Relator, MAZZA, in violation of 31 U.S.C. § 3730 (h) and/or assisted and/or conspired with Defendant, MDT and/or THE COUNTY, together with its Supervisors, Managers, Directors and/or de facto employees to harass MAZZA in violation of 31 U.S.C. § 3730 (h) and are each subject to liability under that provision.

137.    As a result of these actions, Relator, MAZZA, is entitled to the relief provided by 31 U.S.C. 3730 (h), including damages in an amount to be determined at trial.

WHEREFORE, with respect to Count I, the Relator, MAZZA, on behalf of herself and the United States, requests that this Court grant the following relief:

(a) Judgment against each named Defendant in an amount equal to three times the amount of damages the United States has sustained because of his/her/its actions, plus a civil penalty of $5,000 to $10,000 for each violation of 31 U.S.C. § 3729, and the costs of this action, with interest including the costs of the United States for its expenses related to this action;

(b) That the Relator, MAZZA, be awarded all costs incurred, including reasonable attorneys' fees;

(c) That in the event that the United States intervenes in this action, the Relator be awarded 25%, but in no event less than 15% of the proceeds of the resulting judgment in or settlement of this action;

(d) That in the event that the United States does not intervene in this action, the Relator be awarded 30%, but in no event less than 25% of the proceeds of the resulting judgment in or settlement of this action;

(e) That the Relator be awarded prejudgment interest; and

(f) That the United States and the Relator receive all relief, both in law and equity as this Court determines is appropriate.

WHEREFORE, with respect to Count II, the Relator, MAZZA, on behalf of herself and the United States, requests that this Court grant the following relief:

(a) That Relator, MAZZA, be awarded all relief to which she is entitled pursuant to 31 U.S.C. § 3730(h), including personal injury damages for emotional and mental distress, two times her back pay, interest on the back pay, front pay or reinstatement, attorneys fees and litigation costs; and

(b) Such other and further relief as this Court finds appropriate.

Trial By Jury Demanded.

Dated: December 20th, 2010

JOSEPHS JACK
Attorneys for Relator
2699 South Bayshore Drive
7th Floor
Miami, FL 33133
305-445-3800
305-448-5800 (Fax)

By: _____
Adam C. Josephs
acj@josephsjack.com
Fla. Bar No: 050895
Michael R. Josephs
mrj@josephsjack.com
Fla. Bar No: 119242