**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**CASE NO.: 10-24546 CV (WMH)**

MARJAN MAZZA, on behalf of herself and
the UNITED STATES OF AMERICA,

      Plaintiff/Relator

                                          **JURY TRIAL DEMANDED**

VS.

MIAMI-DADE COUNTY and
MIAMI-DADE TRANSIT DEPARTMENT,

      Defendants.

## PLAINTIFF'S FIRST AMENDED COMPLAINT

PLAINTIFF and RELATOR MARJAN MAZZA (hereinafter "MAZZA" or "RELATOR"), by and through her undersigned counsel, The Josephs Law Firm and Diamond McCarthy LLP, brings this action pursuant to 31 U.S.C. § 3729, *et seq.,* as amended (the False Claims Act), in her own name and the name of the United States Government (hereinafter the "GOVERNMENT"), to recover from Defendants all damages and penalties to which she and the GOVERNMENT are entitled under the *qui tam* and retaliation provisions of that Act.

## I.    INTRODUCTION.

1.      Recently, the Department of Justice ("DOJ"), in announcing a record $5.3 billion in 2012 recoveries under the False Claims Act, described that Act as "quite simply the most powerful tool that we have to deter and redress fraud." In that same press release, DOJ praised those whistleblowers who had alerted them to False Claims Act violations as "brave citizens who step forward to report fraud — often at great personal risk."[1]

---

[1]      December 4, 2012 Department of Justice Press Release ("Acting Associate Attorney General Tony West Speaks at Pen and Pad Briefing Announcing Record Civil FY 2012 Recoveries").

2.     This case arises because one of those "brave citizens", Marjan Mazza, stepped forward, at very great personal risk, to report the systematically fraudulent activities of Miami-Dade County ("THE COUNTY") and the Miami-Dade Transit Department ("MDT").  Those Defendants, acting by and through their agents, employees, directors, managers and/or supervisors, violated the False Claims Act by knowingly defrauding the United States, in a manner calculated to misappropriate hundreds of millions of dollars in Federal Transit Administration ("FTA") grant money.

3.     More specifically, Defendants engaged in a scheme to defraud the GOVERNMENT by knowingly and unlawfully drawing down and misapplying federal grant funds provided to Defendants pursuant to FTA Grants, *e.g.,* despite the Defendants' numerous and specific and false representations to the contrary, Defendants drew down and unlawfully used those federal funds:

- To fund unlawful procurement contracts which did not contain mandatory Buy-America or Davis-Bacon clauses;

- To reimburse themselves for their own personnel costs, despite their consistent failures to meet the federal prerequisites for doing so, including maintaining a "Force Account" to ensure that federal funds were applied only to the reimbursement of eligible costs;

- To generally fund the Defendants' budgets, without regard for whether the governmental expenses reimbursed were eligible for reimbursement under the applicable federal laws, regulations and grant agreements; and

402871v2

- To fund procurement contracts unlawfully awarded through a local preference system, rather than through open competition, in direct contravention of federal regulations regarding federally-funded procurement contracts.

4.      All of these illicit drawdowns occurred while Defendants were repeatedly and falsely asserting to the GOVERNMENT, in writing and under penalty of perjury, that they were in full compliance with the very federal laws, regulations and agreements they were violating.

5.      In response to GOVERNMENT audits into their activities, Defendants also engaged in a scheme to cover up the extent of the fraud on the GOVERNMENT by, among other things, making additional false statements and claims to the GOVERNMENT.

6.      Because MAZZA refused to participate in such fraudulent activities, and actively assisted the GOVERNMENT in investigating them, Defendants retaliated against MAZZA by firing her—solely by reason of her attempts to correct their wrongs, and assure compliance with the federal laws and grant programs that had so generously funded MDT for so many years.

## II.      JURISDICTION AND VENUE.

7.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §§ 1331 (Federal question), and 28 U.S.C. § 1345 (United States a plaintiff).

8.      Venue is proper in the United States District Court for the Southern District of Florida pursuant to 28 U.S.C. §§ 1391 (b) and 1391(c), and under 31 U.S.C. 3732(a), because the Defendants herein can be found in, reside in, and transact and/or have transacted business within this judicial district.  Additionally, the acts which are the subject matter of this complaint occurred within this district.

9.      This action is not jurisdictionally precluded by the public disclosure bar of the False Claims Act, 31 U.S.C. § 3730(e) (4).   Upon information and belief, there has been some "public disclosure" of the matters alleged herein, but this action is not "based upon" any such disclosure.  As one of the high level executive employees of the Defendants, RELATOR MAZZA has "direct and independent knowledge" of the instant allegations.  In addition, RELATOR has offered to provide, and "voluntarily provided," this information to the GOVERNMENT before the filing of her original Complaint.  Specifically, for more than a year prior to the filing of her original Complaint, RELATOR MAZZA worked with, and provided documentation and information regarding the subject frauds, to the U.S. Department of Transportation Office of Inspector General ("OIG").  Therefore, to the extent any of these allegations is deemed to have been based upon a public disclosure, RELATOR MAZZA is an "original source" of this information within the meaning of the False Claims Act, and is expressly excepted from the public disclosure bar.

### III.      PARTIES AND PRINCIPAL PARTICIPANTS.

**A.      PLAINTIFF/RELATOR MARJAN MAZZA.**

10.      Plaintiff/Relator MARJAN MAZZA is a citizen of the United States, residing in Florida.  From June of 2009 until November 2010, she was employed by Defendant MDT as MDT's Assistant Director of Financial Services

11.      MAZZA graduated from Embry Riddle Aeronautical University in 1992 with a Masters in Aviation Business Administration.  Beginning in 1989, she was employed by the Miami-Dade County Aviation Department as an Aviation Specialist in the Planning and Development Division, and then as an Administrative Officer within that Department. After five years with the Miami-Dade County Aviation Department, MAZZA went to work for the Broward

County Aviation Department as the Airport Manager in charge of the Grants & Passenger Facility Charge Administration.  She was then promoted to assistant to the Aviation Department Director, expanding her areas of responsibilities to legislation, and becoming the Department's federal and state government liaison.  Her honors at Broward County included, among other things, a proclamation by the Broward County Board of Commissioners designating November 4, 1998 as "Marjan Mazza Appreciation Day."

12.     In 2001, MAZZA went to work at Miami Dade College as the Chairman of the Eig-Watson School of Aviation.  In 2007, she began work as the Regional Federal Program Analysis Officer for the United States Department of Transportation, Federal Aviation Administration, Great Lakes Region, where she oversaw DOT's federal grants in the Great Lakes region.

13.     As a result of her extensive employment history, MAZZA has accumulated over twenty years of experience in federal and state government work, and come to know the federal grant process from both sides of the table.  In each of her positions, her work focused, in whole or in part, on the requirements for applying for, securing, and administering Department of Transportation grants.

14.     Hired in June of 2009 by Defendant MDT, MAZZA was fired after only a year and a half of service, after she refused to be complicit in the commission and cover-up of Defendants' frauds on the GOVERNMENT, and acted to bring such fraudulent activity to a halt. That was so though the only evaluation of her performance at MDT was consistent with her 20 years of public service:  even at MDT her work was rated "superlative".

402871v2

**B.     THE FEDERAL TRANSIT ADMINISTRATION.**

15.     The Federal Transit Administration (the "FTA") is an administrative agency and unit of the United States Department of Transportation.  Its function is to assist transit agencies and departments in each of the 50 states, the District of Columbia, Puerto Rico, and United States territories in providing public transportation.  Public transportation includes buses, subways, light rail, commuter rail, people movers and vans.

16.     The United States, through the FTA, provides funding to develop new transit systems and to improve, maintain and operate existing transit systems.  It does so by overseeing thousands of grants to hundreds of state and local transit providers, primarily through the FTA's regional and metropolitan offices.  FTA Grants provide funding under a variety of programs to eligible recipients.

**C.     DEFENDANTS.**

17.     Defendant MIAMI-DADE COUNTY ("THE COUNTY") is a political subdivision and municipal organization of the State of Florida providing governmental services to the citizens of Miami-Dade County.

18.     Defendant MIAMI-DADE TRANSIT DEPARTMENT ("MDT") is a local special-purpose governmental entity located in Miami-Dade County, and servicing THE COUNTY from its offices located at 701 NW First Court, 17th Floor, Miami, FL 33136.  MDT's services to THE COUNTY include, but are not limited to, the delivery of four types of public transit services:  Metrobus, Metrorail, Metromover and Paratransit.

19.     At all times material hereto, MDT, by and through its employees, agents, representatives, directors and/or managers, acted as an agent and/or representative of THE COUNTY.

402871v2

**D.      OTHER PERSONS OF RELEVANCE TO THESE PROCEEDINGS.**

20.      Harpal Kapoor (hereinafter "KAPOOR") is a citizen and resident of the United States.  Until his termination, KAPOOR served as Director of MDT for THE COUNTY.  At all times material hereto, KAPOOR had knowledge of the MDT improprieties described herein.  He orchestrated the schemes that caused the misappropriations complained of herein and later sought to prevent the discovery of same. KAPOOR also oversaw the submission of Certifications and Assurances to the FTA necessary to obtain federal funds, knowing full well that these Certifications and Assurances were false representations to the Government.  In the course of his nefarious activities, KAPOOR also routinely harassed, intimidated and subverted MAZZA and any others who questioned his actions and those of the MDT.

21.      Hugh Chen (hereinafter "CHEN") is a citizen and resident of the United States. At all times material, CHEN served as MDT Deputy Director of Operations and was responsible for all purchasing and maintenance contracts within MDT.   CHEN also had oversight responsibilities for the bus, rail and mover departments and their respective budgets.  He was a willing and knowing participant in the wrongful activities of KAPOOR, and steadfastly refused to stop the improper drawdowns of FTA Grant funds each time such wrongdoing was brought to his attention.

22.      George Burgess (hereinafter "BURGESS") is a citizen and resident of the United States and, at all times material hereto, was an employee and agent of THE COUNTY, serving as its County Manager.  BURGESS had knowledge of the complained-of wrongdoing at the time it occurred.  Upon discovering that MAZZA was disclosing the improprieties set forth hereinafter to COUNTY employees Ysela Llort and Jennifer Glazer-Moon, as well as to FTA auditors and the

Office of Inspector General, BURGESS allowed the firing of MAZZA to allow KAPOOR to shift the blame for the fraudulent activities described herein from himself to MAZZA.

23.     Ysela Llort (hereinafter "LLORT") is a citizen and resident of the United States and was, at all relevant times, employed as Assistant County Manager to THE COUNTY.  She had oversight of the MDT and, at all times material hereto, had full knowledge of the improprieties set forth below.

24.     Jennifer Glazer-Moon (hereinafter "GLAZER-MOON") is a citizen and resident of the United States and was employed, at all relevant times, as Director for the Office of Strategic Business Management for THE COUNTY, with budget oversight over MDT.  At all relevant times, GLAZER-MOON also had full knowledge of the improprieties as set forth below.

## IV.    GOVERNING LAW, REGULATIONS AND RULES.

### A.    THE FALSE CLAIMS ACT.

25.     The False Claims Act provides, *inter alia,* that any person who knowingly presents a false or fraudulent claim for payment is liable for a civil penalty of up to $11,000.00 for each claim, plus three times the amount of the damages sustained by the GOVERNMENT. Under certain circumstances, all present here, the False Claims Act also allows private persons to bring an action on behalf of the GOVERNMENT and to share, as permitted by law, in the recovery, where the GOVERNMENT has been a victim of such false claims.  In addition, the False Claims Act permits a private person to sue for damages when that person's efforts to bring such false claims to light have been the subject of retaliation by False Claims Act violators like these Defendants.

402871v2

B.     **OVERVIEW OF FEDERAL TRANSIT ADMINISTRATION GRANTS.**

26.     Recipients of FTA Grants ("Grantees") (*e.g.* THE COUNTY and MDT) are responsible for managing their own programs in strict compliance with federal statutory and administrative requirements.

27.     FTA Grant funds are used to reimburse eligible costs, and a Grantee's use of grant funds must be documented and certified as eligible. That is a condition of payment.

28.     The FTA relies on individual Grantee certifications of compliance with FTA rules and regulations when awarding grants and disbursing funds. These certifications are contained in, *inter alia*, the "Certifications and Assurances" that are periodically required by FTA.

29.     More particularly, in order to receive FTA-assisted federal funds, an applicant like MDT must submit Certifications and Assurances to FTA that are applicable to all projects for which the applicant seeks or intends to seek FTA funding during that FTA fiscal year. These Certifications and Assurances by Applicants (and ultimate Grantees) certify that the Grantee will comply with the laws, regulations, and grant agreement requirements applicable to FTA Grants generally, as well as to the specific laws, regulations, and grant requirements governing specific types of FTA-funded programs and activities.

30.     For example, a Grantee like THE COUNTY or MDT will not only submit certification that it agrees, under pain of perjury, to comply with the laws, regulations and grant requirements applicable to all Grantees, but to those that define, *e.g.*, "Procurement Compliance", and/or those that define lawful compliance with grants under specific programs for, *e.g.*, the "Acquisition of Rolling Stock for Uses in Revenue Service," or the "Clean Fuels Grant Program" or the "Elderly Individuals and Individuals with Disabilities Formula Program and Pilot Program".

31.     ***The signing and submission of Certifications and Assurances by Applicants/Grantees are the predicate to the receipt of FTA Grant funding – in this case hundreds of millions of dollars in federal funds – and they are serious business***.  That is why each Applicant/Grantee like THE COUNTY and MDT must:

a) State that it has signed "under penalties of perjury that the foregoing certifications and assurances, and any other statements made by [the signatory] on behalf of the Applicant are true and correct";

b) State that it "affirms the truthfulness and accuracy of the certifications and assurances it has made in the statements submitted herein with this document and any other submissions made to FTA, and acknowledges that the Program Fraud Civil Remedies Act of 1986, 32 U.S.C. 3801 *et seq.*, and implementing U.S. DOT regulations, "Program Fraud Civil Remedies", 49 CFR part 31, apply to any certification, assurance or submission made to FTA";

c) State that it acknowledges that "[t]he criminal provisions of 18 U.S.C. 1001 apply to any certification, assurance, or submission made in connection with a Federal public transportation program authorized in 49 U.S.C. chapter 53 of any other statute";

d) Have its attorneys certify: (1) that the Grantee has the authority "to make and comply with the certifications and assurances"; (2) that the certifications and assurances have been legally made and constitute legal and binding obligations in the Applicant"; (3) that there is no pending litigation or legislation "that might adversely affect the validity of these certifications and assurances, or the performance of the project"; and

e) Submit such Certifications and Assurances before it draws down federal funds pursuant to the FTA Grant.

402871v2

32.     In general, the required submission of truthful Annual Certifications and Assurances substitutes for the detailed and expensive FTA oversight of Grantees that would otherwise be required.

33.     A Grantee must also monitor, and certify that it will monitor, FTA Grant-supported activities to ensure compliance with the applicable federal laws and regulations, the master and specific grant agreements, and applicable FTA circulars, and ensure that FTA Grant funds that "pass through" the Grantee to a sub-recipient, under the terms of a federally-funded agreement, do so in compliance with those federal requirements.

34.     The Grantee's responsibilities include, but are not limited to:

a)  Demonstrating legal, financial, and technical capacity to carry out the program;

b)  Providing administrative and management support of project implementation;

c)  Ensuring that FTA Grant funds are applied in conformity with Grant Agreements, applicable statutes, codes, ordinances and safety standards;

d)  Ensuring that agents and agencies, consultants, contractors, and subcontractors working with the Grantee under approved third party contracts or inter-agency agreements funded by FTA also satisfy all of the applicable federal requirements;

e)  Preparing Force Account and Cost Allocation Plans, where required, and submitting and obtaining those approvals required before incurring costs;

f)  Preparing and submitting all FTA-required reports;

g)  Updating and retaining all FTA-required reports and records for audits or oversight reviews; and

h)  Ensuring that effective control and accountability are maintained for all FTA Grants and sub-grants, cash, real and personal property, and other assets, as

11

402871v2

Grantees and sub-grantees must ensure that grant monies are properly used and safeguarded, and used solely for authorized purposes.

C.   **FTA GRANTS IN OPERATION:  FTA PREVENTATIVE MAINTENANCE GRANTS AS AN EXAMPLE.**

35.     The FTA has several major assistance programs for eligible activities.  Funds for these activities are provided through legislative formulas or discretionary authority and provided on an 80/20 federal/local funding match basis.

36.     The FTA Grant funds which Defendants fraudulently misappropriated include, but are not limited to funds granted pursuant to:

    a)  49 U.S.C. § 5307;

    b)  49 U.S.C. § 5309; and

    c)  49 U.S.C. § 5310.

37.     49 U.S.C. § 5307 (hereinafter "Section 5307") is the Urbanized Area Formula Grant Program. This Program makes federal funds available for transit planning, capital and operating assistance in urbanized areas, like THE COUNTY, relating to busing services.

38.     49 U.S.C. § 5309 (hereinafter "Section 5309") is the Capital Investment Grant Program.  Section 5309 grants fund three different programs:

    a)  fixed guideway modernization in areas with populations over 200,000 with fixed guideway segments at least seven years old (based on a formula);

    b)  construction and extension of new fixed guideway systems (New Starts, Small Starts, and Very Small Starts Programs); and

    c)  purchase of bus and bus related equipment and facilities in both urbanized and non-urbanized areas (Bus and Bus Facility Program).

39.     49 U.S.C. § 5310 (hereinafter "Section 5310") is the Elderly Individuals and Individuals with Disabilities Grant Program. This Program makes federal funds available for

402871v2

transportation services planned, designed and administered to meet the special transportation needs of elderly individuals and individuals with disabilities.

40.     FTA awards preventative maintenance contracts for bus and rail transportation support.  The extent of the funding available is based on a formula derived from ridership reports collected and submitted to FTA by MDT.

41.     In appropriate circumstances, funds from bus and rail preventative maintenance contract grants may be used for grant-eligible salaries, as well as for the procurement of spare parts and acquisition of capital, including new equipment.

42.     More specifically, in the event a Grantee uses its own labor force to perform, *e.g.*, preventative maintenance, the Grantee must have in place a "Force Account" relating to the use of the grantee's own labor force to carry out a capital grant project.  That is true for Section 5307 grants, as well as for grants under Sections 5309 and 5310.  Force Account work may consist of design, construction, refurbishment, inspection, and construction management activities, if eligible for reimbursement under the grant.  Incremental labor costs from flagging protection, service diversions, or other activities directly related to the capital grant may also be defined as force account work.  Force Account work can also include major capital project work on rolling stock, such as preventative maintenance activities related to such rolling stock.

43.     FTA prior review of a Force Account Plan and justification are required where the total estimated cost of Force Account work to be performed under a grant is greater than $10 million.

44.     To be eligible for reimbursement for Force Account work, a Grantee must provide the FTA with the following information before incurring costs:

        a)  The justification(s) for using Grantee forces;

402871v2

b) A Force Account plan;

c) A description of the Scope of Work;

d) Copies of construction plans and specification which include: (1) detailed estimates of costs; (2) detailed schedules and budgets; and (3) a copy of the proposed Cooperative Agreement when another public agency is involved;

e) The present worth of the estimated cash drawdown for both the Force Account and private sector contract options;

f) Certifications that the costs presented are fair and reasonable;

g) The cost of preparing documents; costs of administration and inspection; costs of labor and materials; and

h) An analysis of Force Account labor availability.

45.     Federal Transit Agency Circular provides that in order for a grantee of federal funds to utilize those funds for the payment of its own labor in the performance of Preventive Maintenance, a proper Force Account Plan, amongst other things, must be in place.

46.     The establishment of a Force Account is a required condition of payment of FTA Grant funds for Grantee labor used on federally funded projects.   In the absence of a Force Account, a Grantee cannot be reimbursed, with FTA Grant funds, for the expense of using its own labor force on preventative maintenance or other federally funded projects.

**D.     OTHER EXAMPLES OF RELEVANCE TO THESE PROCEEDINGS.**

47.     The description of the Preventative Maintenance programs is representative of the general structure and operation of FTA Grants, and of the limitations on the uses of the federal funds committed under those grants.   Two other examples, both relating to MDT's unlawful procurement formalities, further highlight the manner in which FTA Grants are supposed to work,

402871v2

where the federal funds granted thereunder are intended to be used – lawfully – in MDT's procurement of goods and services.

48.     These examples arise from the fact that, as a matter of law, every federally-funded contract and/or agreement entered into by the MDT and third parties **must** specifically contain certain language and provisions set forth by federal law and regulations, and required as a matter of federal public policy.

### The Required Buy-America Procurement Contract Clause.

49.     Grantees must also follow procurement procedures set forth in the current version of FTA Circular 4220.1.  Additional guidance is provided in FTA's Best Practices Procurement Manual.  Two areas of particular importance for rolling stock procurements are the "Buy America" and "Pre-Award and Post Delivery Audits for Rolling Stock" requirements.

50.     With certain exceptions not relevant here, the FTA may not obligate funds for a public transportation project unless the steel, iron, and manufactured goods used in the project are produced in the United States (49 C.F.R. § 661).  That is the "Buy America" requirement.

51.     Under the "Buy America Requirements," THE COUNTY and MDT must ensure, verify and certify to the FTA that all federal funds will be used, are being used and have been used to purchase American produced goods.  Further, the Grantee must notify subcontractors and sub-recipients of this requirement and include contract language requiring specific compliance and certifications that the required language was used in the contracts with those contractors and other sub-recipients.

52.     Grant applicants seeking to acquire rolling stock must also certify that they will comply with Pre-Award and Post-Delivery Review requirements (49 C.F.R. § 663).  These reviews are intended to improve compliance with Buy America requirements, with the Grantee's

bid specifications and with federal motor vehicle safety standards.  The Grantee must keep the relevant records on file, and make them available to FTA upon request.  Compliance with these requirements must also be certified on the Annual List of Certifications and Assurances.

53.     The Buy America requirements and the provision of such requirements in procurement contracts are not optional.  They are a condition of payment.  In other words, the GOVERNMENT will not pay claims for reimbursement for procurements under a contract that does not contain Buy America requirements.

54.     Precisely because these Buy America clauses are important and mandatory, the FTA helps Grantees meet the Buy America requirements.  For that reason, the FTA provides model mandatory Buy America clause/language for grantees to use in satisfying the Buy America regulation, at 49 C.F.R. § 661.13.  That FTA model language provides:

> Buy America – The contractor agrees to comply with 49 U.S.C. 5323(j) and 49 C.R. R Part 661, which provide that Federal funds may not be obligated unless steel, iron, and manufactured products used in FTA-funded projects are produced in the United States, unless a waiver has been granted by FTA or the product is subject to a general waiver.  General waivers are listed in 49 C.F.R. 661.7, and include final assembly in the United States for 15 passenger vans and 15 passenger wagons produced by Chrysler Corporation, and microcomputer equipment and software.     Separate requirements for rolling stock are set out at 49 U.S.C. 5323(j)(2)(c) and 49 C.F.R. 661.11.  Rolling stock must be assembled in the United States and have a 60 percent domestic content.

55.     Despite the foregoing law, rules, regulations, and easy access to the FTA's sample Buy America clause, no such language, or any similar language, was employed in MDT's procurement contracts, and the Buy America program was left to be ignored and unenforced, at both the MDT and the MDT vendor levels.

**The Required Davis-Bacon Procurement Contract Clause.**

56.     The Davis-Bacon Act provides that contracts in excess of $2,000 to which the United States is a party (*i.e.,* contracts in which federal funds are involved) for construction, alteration, or repair of public buildings or public works within the United States shall contain a clause that no laborer or mechanic employed directly upon the site of the work shall receive less than the prevailing wage rates as determined by the Secretary of Labor.   Such a clause is mandated by the Davis-Bacon Act.   Its implementing federal regulations are found in Appendix A.1 of FTA Circular 4220.1E.   The Best Practices Procurement Manual applies to all FTA Grantees and sub-grantees that contract with outside sources under FTA assistance programs. FTA Grant recipients who utilize FTA formula funds for operating assistance, *e.g.* THE COUNTY and MDT, are required to follow Circular 4220.1E.

57.     The FTA Master Agreement contains a list of statutory and regulatory requirements applicable to grantee procurements, which list expressly includes the mandatory Davis-Bacon Act, Disadvantaged Business Enterprise, Clean Air, and Buy America language to be used in federally funded procurement contracts.

58.     Despite these federal laws and regulations, MDT routinely entered into contracts and agreements with various bidders and/or offerors using contract formats which failed to contain the requisite Buy-America language or the Davis-Bacon Act language.

59.     Despite having knowledge that the procurement contracts did not comply with federal statutory and administrative rules, MDT nevertheless drew down millions of dollars in federal grant funds provided by the FTA to the MDT, pursuant to 49 U.S.C. §§ 5307 and 5309, and applied those funds to non-compliant contracts.

402871v2

60.     FTA relies on Grantees' self-certifications that their procurement system meets FTA requirements and that a Grantee has the technical capacity to comply with federal procurement requirements.   All Grantees must also self-certify, as part of the Annual Certification/Assurance Process, that procurement contracts contain the required Buy-America and Davis-Bacon contractual language.

## E.     DRAWDOWNS AGAINST FTA GRANT FUNDS.

61.     Grantees make electronic drawdowns of funds through an FTA funds processing system known as "ECHO" (Electronic Clearinghouse Operation).  By using the ECHO or "ECHO Web" system, a Grantee agrees to comply with the requirements of 49 C.F.R. § 18.21 and 19.22, and 31 C.F.R. part 205, which requirements are further described in FTA's ECHO System User Manual for Grantees.   The guidelines for disbursements are also established in Department of Treasury Circular 1075, part 205, "Withdrawal of Cash from the Treasury for Advances under Federal Grant and Other Programs," and by FTA financing agreements.   Collectively, these guidelines state that the grant recipient organization shall commit itself to:

a)  Initiating cash draw downs only for immediate disbursement needs *i.e.,* those that will be needed in three business days or less.  (Excess Federal funds drawn down and held for more than three days must be returned to FTA, with interest);

b)  Timely reporting of cash disbursements and balances as required by the FTA;

c)  Limiting drawdowns to eligible project costs, which means NOT drawing down funds for a project in an amount that would exceed the sum authorized by FTA or the current available balance for that project; and

d)  Providing control over and accountability for all project funds consistent with FTA requirements and procedures for use of the ECHO System; and

e) Furnishing FTA-required reports of cash disbursements and balances.

62.     The ECHO system, like the Certifications and Assurances, may not be abused. As the FTA Master Agreement puts it:  "By executing the Grant Agreement or Compensation Agreement for the Project, the Recipient certifies or affirms the truthfulness or accuracy of each statement it has made, it makes, or it may make in connection with the Project", and any "false fictitious, or fraudulent claim, statement, submission, certification, assurance or representation to the Federal Government" is subject to civil penalties and/or criminal prosecution.

## V.     FACTUAL ALLEGATIONS.

### A.     PLAINTIFF/RELATOR MAZZA'S DISTRESSING INTRODUCTION TO MDT'S WAYS OF DOING BUSINESS.

63.     What MAZZA brought to MDT is documented in the results of her pre-employment interviews.  MAZZA blew away the competition in the interviews, receiving the highest scores, and was rated as superior by all who saw her.  Moreover, she was said to possess "***demonstrable professional expertise***…" in the areas that were important for her job.  No prior employer, including the GOVERNMENT, had anything but the best to say about her as a person and as a professional.  Her work history was impeccable.  Her knowledge of the federal grant process was substantial.  It should also have been valuable to MDT.

64.     MAZZA'S new boss, the director of MDT, was KAPOOR, a tyrant and a closet incompetent.  Personally, KAPOOR was a bully who ran the department with threats, unlawful demands and blatant favoritism.  He tolerated no dissent, and his style of management was an abrasive combination of puppeteer and bulldozer.

65.     Importantly, KAPOOR had no respect for federal regulations that pertained to the use of federal funds and regularly encouraged the disregard of federal grant regulations.  He constantly shifted lines of authority (*i.e.*, by removing grant administration from MAZZA'S

department once she began to question MDT's procedures), and did so to cloud accountability and camouflage the real deficiencies in the department and the nature and results of his mismanagement.   With the tacit approval of other high ranking Miami-Dade employees, KAPOOR and his allies also engaged in a cover up of his serial wrongdoing.

66.     KAPOOR fostered an environment where federal regulations were routinely violated, putting hundreds of millions of MDT grant dollars at risk.  Indeed, the unlawful conduct that was the subject of the federal government's unprecedented repeat audits of MDT in 2010-2012, the suspension of FTA Grant funds and the like, had begun as far back as 2004, long before MAZZA joined MDT.

67.     It was inevitable that KAPOOR would clash with MAZZA.  MAZZA was and is, as one of her colleagues has testified, "highly ethical, a consummate professional, forthright, fair and impressive".  She was also someone who valued, respected and followed the letter of the law, and those that worked with her knew she followed that path.  That intolerance for wrongdoing created problems for KAPOOR.  All too often KAPOOR sought to suppress the truth, while MAZZA was determined to bring it forward.

68.     Unfortunately, as time went on, and MAZZA became familiar with the operations of MDT and with its abuses of federal grants and grant monies, the gulf between MAZZA and KAPOOR grew wider.  And it widened very sharply once it became clear to MAZZA that her reporting of unlawful conduct to KAPOOR and others at MDT would produce no result, and no change in MDT conduct.  That failure to address MDT illegalities not only led to an increasing number of conflicts with KAPOOR, it led to MAZZA'S open cooperation with the FBI, the Department of Transportation Office of Inspector General ("OIG") and the FTA.

B.      **WHAT MAZZA FOUND:  THE DEFENDANTS' MYRIAD VIOLATIONS OF THE FALSE CLAIMS ACT.**

69.     Since 1996, THE COUNTY, through MDT, has routinely applied for and received authority to utilize FTA Grant funds pursuant to 49 U.S.C. §§ 5307 and 5309.

70.     Since 2004, MDT has entered into Grant Agreements with FTA conditioned on specific and sworn assurances of compliance with specific federal guidelines—most notably contracts for grants to provide preventative maintenance on buses and rail ("PM 5307 and 5309" contracts).

71.     As of June 30, 2010, MDT had 34 active grants for FTA.  The total amount to be awarded under these active grants was $540,643,060.  The amount that MDT has expended under active FTA grants by June 30, 2010 was $369,387,030.

72.     As a recipient of these FTA Grant funds, THE COUNTY and MDT routinely certified and assured that they had complied with the FTA's grant rules and requirements.  They did so knowing that grant applicants like themselves who made false, fictitious or fraudulent claims, statements, certifications, assurances or representations to FTA in connection with the federal grant process were subject to civil and criminal prosecution under, *i.e.*, the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801 *et seq.* and its implementing regulations, as well as under 49 U.S.C. § 5323(e) and 18 U.S.C. § 1001.

**MDT's Claims for Reimbursement for the Costs of its Own Labor Force Were Fraudulent.**

73.     From 2003 through and including 2009, THE COUNTY, through MDT, drew down FTA Grant funds to reimburse itself for preventive maintenance contract expenses, notwithstanding its complete failure to keep Force Account records regarding the MDT personnel

purportedly working on those contracts. Absent an approved Force Account, each and every drawdown to reimburse the costs of MDT's labor expenses was false and fraudulent.

74. With regard to the preventive maintenance grants, such as those granted pursuant to Sections 5307 and 5309, reimbursable labor costs are limited to labor directly related to those activities authorized by the particular FTA Grant. Only that labor authorized under the FTA Grant may be paid (and only 80% of that may be paid with GOVERNMENT funds). Reimbursement of expenses associated with a Force Account must be based upon actual expenses and labor spent on the eligible work project. The maintenance of a Force Account ensures this compliance, and prevents fraudulent misallocation of FTA Grant funds.

75. From 2003 through late 2009, MDT failed to have any, let alone an approved, Force Account, the existence of which is a precondition to the claim and receipt of FTA Grant funds. Moreover MDT's failure to maintain the Force Account facilitated MDT's use of FTA Grant funds to fund activities that were impermissible under the grants, (*i.e.*, to fund MDT's operating budget shortfalls).

76. MDT's failure to maintain a Force Account allowed MDT employee Carrie Stern to repeatedly draw down FTA Grant money for ineligible MDT operating costs. In fact, Stern used MDT's budget numbers to draw down FTA Grant funds, without any regard for the validity or eligibility of the claimed expense.

77. Ms. Stern did so though she was specifically informed by Margarita M. Sandberg, Program Manager for FTA Region IV, on or about July 22, 2009, that MDT needed to have a Force Account in place. CHEN was also aware that MDT was required to have a Force Account since at least 2003.

402871v2

78.     Despite knowing that there were no timesheets, semiannual certifications or other documentation to substantiate the projects and specifically allocate the costs, (*i.e.*, no documentation as to which eligible workers worked on what projects, what eligible work was performed, and how many hours each eligible worker worked), MDT, its employees, officers and directors, routinely drew from FTA funds granted, pursuant to §§ 5307 and 5309, to pay for salaries of employees and meet their budgets.

79.     Accordingly, each drawdown of FTA Grant funds, in the absence of a Force Account, was a false claim against the FTA and the Government.

80.     All of MDT's drawdowns for labor or ineligible budgeted expenses were false and fraudulent for the additional reason that such drawdowns were for ineligible FTA Grant expenses and far exceeded allowable reimbursable expenses.

81.     Additionally, despite having failed to maintain a Force Account, MDT, by KAPOOR's and Liebhabor's electric signatures, falsely certified both impliedly and expressly that it was in compliance with all conditions for payment.

82.     The proper maintenance of Force Accounts is a condition of receipt of FTA Grant funds for the Grantee's labor costs.  Had the FTA known that MDT had not maintained Force Accounts for the years 2003 through 2009, the FTA would have suspended MDT's ability to draw down funds to reimburse itself for the cost of those MDT personnel who allegedly worked on preventative maintenance.

83.     The grants that were used to reimburse MDT for Preventive Maintenance, despite the non-existence of a Force Account, may be described as follows:

| FISCAL YEAR | FTA GRANT NO. | PREVENTIVE MAINTENANCE AMOUNTS DRAWN DOWN |
|---|---|---|
| 2003 | FL-03-0249 | $  4,629,864.28 |
| 2003 | FL-90-X493 | $28,740,811.00 |
| 2004 | FL-03-0267 | $  2,702,454.00 |
| 2004 | FL-90-X513 | $29,884,060.00 |
| 2005 | FL-03-0293 | $10,726,202.00 |
| 2005 | FL-90-X546 | $39,023,995.00 |
| 2006 | FL-05-0088 | $13,089,932.28 |
| 2007 | FL-05-0095 | $14,918,842.00 |
| 2007 | FL-90-X636 | $42,170,501.00 |
| 2008 | FL-05-0100 | $17,185,139.00 |
| 2008 | FL-90-X674 | $43,458,924.00 |

84.     This represents a total of **$286,040,581.56** of federal funds wrongfully drawn down by MDT.  As to each drawdown for each grant, MDT falsely certified compliance with FTA requirements that it maintain a Force Account and only draw down costs eligible for reimbursement under the terms of the FTA Grant.

85.     Within six weeks of MAZZA commencing work at MDT in 2009, she instituted an FTA-approved Force Account.

**Defendants Also Failed to Include Required Buy America and Davis-Bacon Contract Clauses in FTA-Funded Contracts.**

86.     MDT also entered into a multitude of federally-funded contracts and agreements with various contractors in which it failed to include the Buy-America language or the Davis-Bacon Act clauses that were a prerequisite to the federal funding of those contracts.

24

87.     Despite having knowledge that the contracts and/or agreements were missing the required clauses, MDT drew grant funds provided by the FTA to the MDT pursuant to 49 U.S.C. §§ 5307 and 5309, and applied those funds to the contracts.

88.     Because the inclusion of the Buy-America and Davis-Bacon Act clauses in the contracts, were conditions of payment, by requesting and applying FTA Grant funds to the contracts, MDT made false claims in violation of the False Claims Act.

89.     Had the FTA been aware that FTA Grant funds were being applied to such contracts, they would have disallowed those payments and suspended MDT's ability to draw down FTA Grant funds for those contracts.  That is what happened when FTA began to realize the scope of MDT's violations in this regard.

90.     Nevertheless, MDT certified expressly and implicitly and repeatedly that its procurement system met all FTA requirements, including the requirement that contracts contain the Buy America and Davis-Bacon Act clauses.  For this additional reason, MDT's failure to include these clauses in contracts amounted to violations of the False Claims Act.

91.     From 2003 to 2009, over 95% of the MDT contracts which were represented to the FTA as appropriate for FTA Grant funding did not contain the Buy America and Davis-Bacon clauses.  More particularly, for calendar years 2004 through 2010, Relator MAZZA has identified the following specific dollar amounts of violations fraudulently obtained by Defendants for expenditure on contracts without the federally required clauses:

        a)  2004   $451,186

        b)  2005   $818,542

        c)  2006   $129,944

        d)  2008   $611,653

402871v2

e) 2009  $471,044

f) 2010  $154,589

92.     The following are additional, detailed examples of specific contracts that did not

have the requisite Buy-America and Davis-Bacon clauses, and therefore become the subject of

MDT's  false claims:

| Index code | Contract Number | Purchase Order | Vendor | Amount Funded |
|---|---|---|---|---|
| MTX350240501 | 7855-4/10-1 | POMT0600866 | Atlantic Ford | $299,372.00 |
| MTX350240501 | 855-4/10-1 | POMT0600800 | Atlantic Ford | $249,192.00 |
| MTX350240501 | 7855-4/10-1 | POMT0600801 | Atlantic Ford | $159,886.00 |
| MTBUS1CT0008 | GPC III-MDT-1 | PCMT0900003 | Corradino Group | $149,017.00 |
| MTX636114209 | E8870-MT | APMT0900003 | Dash Door & Closer | $146,892.45 |

93.     These five contracts only scratch the surface of a procurement system rife with

fraud and abuse.  As one example, THE COUNTY contracted with Goodyear Tire & Rubber Co.

for tire leasing and vehicle tire services for the period January 17, 2005 through December 16,

2010.   Attached as Exhibit A is a copy of that contract.   The total contract amount was

$27,540,000.  The contract fails to include any clauses containing Buy America or Davis Bacon

provisions.   In 2008 alone, MDT drew down $4,266,140.47 of federal grant funds on this

contract.

94.     Attached hereto as Exhibit B is a schedule of the purchase order, contract number,

vendor, amount falsely claimed as a reimbursement and the nature of the expense.  Each and

every one of the listed drawdowns is a false claim.  Had FTA known of the violative nature of this

contract, and ineligible expenses, FTA would have denied the claims or required refunds plus interest.

95.     Another representative sample of false claims:  THE COUNTY contracted with Kauff's of Miami Inc. for towing services for the period January 1, 2008 through December 31, 2008.  Attached as Exhibit C is a copy of that contract.  The total contract amount was $935,000.  The contract fails to include any clauses containing Buy America or Davis-Bacon provisions.  In 2008, MDT drew down $190,773.58 of FTA Grant funds on this contract.  Attached hereto as Exhibit D is a schedule of the contract reference number, contract, vendor name, index number, transaction document, transaction amount, transaction description and fiscal period.  Each and every one of the listed drawdowns is a false claim.  Had FTA known of the violative nature of this contract, and of the ineligible expenses for which reimbursement was claimed thereunder, FTA would have denied the claims or required refunds plus interest.

96.     In 2007, MDT Division 72 bus maintenance expenses paid to Kauff's of Miami totaled $265,235, all of which was federally reimbursed with FTA grant funds.  Attached hereto as Exhibit E are the details of each false claim associated with the 2007 drawdowns to pay Kauff's of Miami.

97.     Another representative sample of false claims involved THE COUNTY's contracts with Triptow Enterprises Inc. for truck/bus and trailer alignment for the period July 1, 2007 through June 30, 2008.  Attached as Exhibit F is a copy of that contract.  The total contract amount was $405,000.  The contract fails to include any clauses containing Buy America or Davis-Bacon provisions.  In fiscal year 2007, MDT drew down $185,279 of FTA Grant funds on this contract.  Attached hereto as Exhibit G is a schedule of the date each drawdown was posted, transaction code, document reference, contract reference number, check amount, description code

402871v2

and vendor.  Each and every one of the listed drawdowns is a false claim.  Had FTA known of the violative nature of this contract, and ineligible expenses, FTA would have denied the claims or required refunds plus interest.

98.     Another representative sample of false claims arose in connection with THE COUNTY's contract with the Florida Association of Rehab Fac, Inc. for janitorial services for the period May 11, 2009 through May 11, 2010.  Attached as Exhibit H is a copy of that contract. The total contract amount was $3,264,000.00.   The contract fails to include any clauses containing Buy America or Davis-Bacon provisions.

99.     In the prior fiscal year 2008, MDT drew down $419,772 of FTA Grant funds to reimburse ineligible expenses for janitorial services provided by Florida Association of Rehab Fac, Inc.  Attached hereto as Exhibit I is the contract and schedule of the reference number, contract number, vendor name, index number, transaction document number, transaction amount, transaction description, and fiscal period.  Each and every one of the listed draw downs is a false claim.   Had FTA known of the violative nature of this contract, and ineligibility of these expenses, FTA would have denied the claims or required refunds plus interest.

100.    For fiscal year 2008, MDT drew down $317,600 of FTA Grant funds to reimburse ineligible expenses for upholstery and refurbishing services provided by Prison Rehab Industries & Div Enterprise, Inc.  Attached hereto as Exhibit J is the contract and schedule of the date the claim was posted, transaction code, document reference, contract ID, amount of the claim, description of the service and vendor.   Because each of the federally required clauses was omitted, each and every one of the listed drawdowns is a false claim.  Had FTA known of the violative nature of this contract, and the ineligibility of these expenses, FTA would have denied the claims or required refunds plus interest.

101.     For the period October 1, 2007 through September 2008, MDT entered a contract with Aramark Uniform & Career Apparel, LLC, this for the provision of uniform rental with laundry services.  Attached hereto as Exhibit K is a copy of that contract.  The contract amount is $250,000.  The contract fails to include Buy America and Davis-Bacon clauses.

102.     For the period under Exhibit K, MDT nevertheless drew down FTA Grant funds to reimburse ineligible expenses for uniform rental with laundry services provided by Aramark Uniform & Career Apparel, LLC.  Attached hereto as Exhibit L is the schedule of the reference number, contract vendor name, index number, transaction document number, amount of the claim, and month and year of the expense.  Each and every one of the listed drawdowns is a false claim.   Had FTA known of the violative nature of this contract, and ineligibility of these expenses, FTA would have denied the claims or required refunds plus interest.

103.     For the period June 1, 2010 through November 30, 2012, MDT entered into a contract with Aramark Uniform & Career Apparel, LLC for the provision of shop towel rental and laundry services.   Attached hereto as Exhibit M is a copy of that contract.   The contract amount is $399,000.  The contract fails to include Buy America and Davis-Bacon clauses.

104.     For the prior fiscal year 2008, MDT drew down FTA Grant funds to reimburse ineligible expenses for shop towel and laundry expenses for services provided by Aramark Uniform & Career Apparel, LLC.  Attached hereto as Exhibit N is the schedule of the reference number, contract vendor name, index number, transaction document number, amount of the claim, and month and year of the expense.  Each and every one of the listed drawdowns is a false claim.   Had FTA known of the violative nature of this contract, and ineligibility of these expenses, FTA would have denied the claims or required refunds plus interest.

105.    For the period February 1, 2007 through July 31, 2008, MDT contracted with a number of local and nonlocal vendors for transit revenue vehicle repair/part services.  The total value of these contracts was $40,704,500.  Attached hereto as Exhibit O are these contracts.  With just one vehicle repair vendor, MDT drew down $1,204,066 of FTA Grant funds to pay Florida Detroit Diesel-Allison, Inc.  Attached hereto as Exhibit P is a schedule of the date the claim was posted, transaction code, document reference, contract ID, amount of the claim, description of the service and vendor.  None of the contracts in Exhibit O contain the required Buy America or Davis-Bacon clauses, and each and every one of the listed drawdowns in Exhibit P is a false claim.  Had FTA known of the violative nature of these contracts, and ineligibility of these expenses, FTA would have denied the claims or required refunds plus interest.

106.    For the period April 1, 2008 through March 31, 2013, Defendants contracted with several entities to provide construction equipment rental.  The aggregate total contract amount was $15,500,000.  The local entities involved were:

- United Rental North America, Inc.

- Hertz Equipment Rental Corp.

- Eastman Aggregate Enterprises, LLC

- Rockland Contracting, Inc.

- Equipment & Tools Solution, Inc.

- Action Rentals, LLC

- Trane U.S., Inc.

- Poes Rental of Kendall, LLC

- Niff Rental, LLC

- Gold Coast Hi Lift, Inc.

- Randall Rents of Florida, Inc.

- 3DG, LLC

- Miami Tool Rental, Inc.

- Sunbelt Rentals, Inc.

- Kelly Tractor Co.

- Gold Coast Crane Service, Inc.

- Ring Power Corporation

- Frank H. Poe, Inc.

- Thomas Maintenance Service, Inc.

- RVL Equipment, Inc.

- Pantropic Power, Inc.

- Allied Trucking of Florida, Inc.

- Neff Rental, Inc.

- Best Equipment & Repair

- National Transportation Co., Inc.

107.    None of the contracts with the above-listed entities contain Buy America or Davis-Bacon clauses.  Attached hereto as Exhibit Q are the above listed contracts.  As a result, each and every one of the drawdowns to pay the contracts identified in Exhibit Q was a false claim, and—like so many other MDT draw downs—completely inconsistent with the sworn statements of compliance MDT was simultaneously submitting to FTA.  Had FTA known of the violative nature of these contracts, and the ineligibility of these expenses, FTA would have denied the claims for reimbursement or required refunds plus interest.

402871v2

**MDT Improperly Used Local Preferences in the Bidding Process.**

108.    Though such practices are expressly forbidden in regard to federally-funded contracts, MDT requires offerors and bidders on MDT contracts to be members of the Miami-Dade County User Access Program ("UAP").

109.    Pursuant to the UAP, non-COUNTY municipalities/agencies that wish to be eligible to bid on MDT Contracts must complete THE COUNTY's Joint Purchase and Entity Revenue Sharing Agreement.  Additionally, a bidder must be approved for participation by the Department of Procurement Management ("DPM") as a prerequisite to eligibility for County contracts and the payments thereunder.

110.    THE COUNTY'S UAP also provides for a two percent (2%) discount on prices, collected through a COUNTY deduction from vendor invoices for newly established contracts, and negotiated modifications of existing contracts, including renewals.

111.    Revenue generated from the UAP program funds the operations of THE COUNTY'S Department of Procurement Management.  In other words, the program ostensibly funds THE COUNTY'S operational costs of entering into contracts.  In reality, the funds are used for other matters and frequently for matters wholly unrelated to transit.

112.    Federal law and regulations prohibit a Grantee (*e.g.* THE COUNTY and MDT) from utilizing a UAP for contracts which will be funded using federal grants.

113.    The use of a local preference, such as the UAP, contravenes *The Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments*, 49 CFR, Part 18. The federal regulation states, in relevant part:

> a) "All procurement transactions will be conducted in a manner providing full and open competition consistent with the standards of §18.36."  49 CFR, 18.16(c)(1).

b) "Grantees and subgrantees will conduct procurements in a manner that prohibits the use of statutorily or administratively imposed in-State or local geographical preferences in the evaluation of bids or proposals, except in those cases where applicable Federal statutes expressly mandate or encourage geographic preference." 49 CFR, 18.16(c)(2).

114.    The purpose of the federal regulation is to promote competition.  MDT's use of the UAP does exactly the opposite – it restricts competition to participants in the UAP, and also diverts federal funds to those non-compliant and anti-competitive contracts.

115.    As early as 2004, the FTA informed MDT that the use of UAP's in contracts utilizing FTA-assisted procurements violated federal law and regulations.

116.    Ignoring federal law, MDT nevertheless continued to certify and represent to the FTA that it was in conformity with all federal standards, and submitted claims to the FTA to pay for UAP contracts containing the 2% UAP fee.

117.    In so doing, THE COUNTY and MDT not only intentionally, improperly and illegally engaged in the awarding of federally-funded contracts in violation of the federal laws and regulations, it did so for financial gain.

118.    As Defendants have admitted, virtually every §§ 5307 and 5309 contract and/or agreement on which MDT drew down federal funds contained the 2% UAP fee.

119.    The FTA requires, as a condition for payment of federal funds, that a Grantee like MDT certify and assure that all funds are properly administered pursuant to federal laws and regulations, and that they go only to eligible recipients.

402871v2

120.     Nevertheless, from 2004 to 2010, MDT certified and assured to the FTA that the FTA Grant funds MDT was utilizing were being properly expended in accordance with the laws and regulations of the GOVERNMENT and FTA, when they were not.

121.     These certifications and assurances both implied and express, were improper, false and in violation of the False Claims Act.

122.     For representative samples of contracts and false claims that violate UAP rules, please see Exhibits C, D, E, F, G, H, I, J, K, L, M, N, O, P and Q hereto.

### C.     MAZZA THE WHISTLEBLOWER.

123.     In 2009, DOT conducted a random improper payment audit and discovered that several 2007 contracts failed to contain the mandatory federal Buy America and Davis-Bacon language.

124.     Shortly thereafter, the FTA required MDT to perform an internal review of all contracts and report to the FTA how many other federally-funded contracts did not contain the mandatory federal language or otherwise comply with federal law and/or the requirements for the federal grants.

125.     MDT allegedly performed a review and reported that four contracts did not contain the proper language.  As would be expected, the total amount of $845,930.00 paid out under these four contracts was then returned to the FTA.

126.     The violative contracts identified through audits of MDT were just the tip of the iceberg.  When FTA began to uncover the failure of MDT to include the requisite Buy-America and Davis-Bacon clauses, MDT's reaction was <u>not</u> to ensure system-wide conformity with the applicable law and regulations.  Instead, MDT engaged in a scheme to conceal the scope and magnitude of its non-compliance from FTA, knowing that absent such deception, FTA would

34

require huge refunds of grant funds used to pay contracts that violated GOVERNMENT and FTA rules regarding Buy-America and Davis-Bacon clauses.

127.    On December 23, 2009, CHEN e-mailed Dudley Whyte of the FTA and falsely reported that "[w]e have conducted a complete internal review of all Miami-Dade Transit procurements which used federal assistance during the Triennial Audit period covering October 1, 2006-September 30, 2009." CHEN further falsely represented that "[a]s a result of our review we identified five procurements for manufactured goods and three engineering and construction procurements that either used contracts that did not contain Buy America."

128.    Whyte responded that FTA would get back to CHEN on how FTA will proceed to be reimbursed for funds provided in connection with the few contracts CHEN identified.

129.    As a result of MDT's minimal disclosure and concealment of the scope and magnitude of MDT's failures, MDT was only required to refund $845,930 including interest to FTA for MDT's failure to include Buy-America or Davis-Bacon clauses in the identified contracts.  By virtue of CHEN's concealment scheme, MDT was able to wrongfully keep hundreds of millions of dollars of federal grant funds that were spent on violative contracts and that should have been refunded to FTA.

130.    In actuality, approximately 95% of the federally funded contracts that MDT entered into lacked the mandatory federal clauses.

131.    In 2010, the GOVERNMENT conducted another audit of the 2008 contracts and uncovered additional contracts lacking the federally mandated contract clauses.

132.     In an effort to avoid detection of the heretofore described wrongdoing, in 2010 and before, Defendants engaged in a practice of dismantling internal controls, falsifying reports, tailoring accounting reports, giving less than candid responses to the federal officials investigating

such matters, and threatening the livelihood of any employee, like MAZZA, who refused to support and/or otherwise participate in the original wrongdoing and the concerted effort to avoid federal detection of that wrongdoing.

133.    In or around September 2010, KAPOOR, in advance of an upcoming FTA Financial Management Oversight Audit, and as part of his scheme to avoid detection of the improper use of federal funds resulting from, *inter alia*, the Force Account and contractual language deficiencies, repeatedly and forcefully attempted to pressure and harass MAZZA and other employees, supervisors, managers and directors of MDT to generate a false portrait of Defendants' supposed compliance, as to the federal grants to MDT under investigation, with the applicable federal law, federal regulations, and grant agreement requirements.

134.    On or about September 29, 2010, KAPOOR also informed all attending a senior staff meeting of their need to "rehearse" for the upcoming meetings with the FTA's Financial Management Oversight Program ("FMO") auditors.

135.    At a later meeting that same day, KAPOOR advised the staff of the need to come up with "revised" numbers for previous fiscal years regarding preventative maintenance grant reimbursements.

136.    This "rehearsal" and demand for "revised" numbers were part of the continued program aimed at hiding the improper conduct of KAPOOR and the impermissible drawdown of federal funds which he had orchestrated.

137.    On or about September 30, 2010, KAPOOR and CHEN went even further, demanding that MAZZA provide FTA auditors with false statements regarding previous years' FTA grant drawdowns, and that she retroactively generate "time-sheets" for as far back as FY 2003, and provide the FTA with those retroactively generated time-sheets.

402871v2

138.    Relator MAZZA's objections to these demands were met with intimidation and harassment, including threats that she would lose her job and be blamed for the improper draw downs of funds, should they be detected.

139.    On October 1, 2010, Relator voiced concerns to GLAZER-MOON regarding MDT's failings in regard to those of its internal controls relating to ridership reporting, fare box collections and revenue reconciliation, and the fragmentation of financial controls for the kiosk, easy card and other practices, all of which MAZZA believed could lead to censure by the FTA, and to the general facilitation of fraud and theft under the FTA Grant program.

140.    MAZZA also made it known to GLAZER-MOON that the executive staff of the MDT was isolating her, treating her in a demeaning manner, harassing her, threatening her, and otherwise making her work life miserable and unbearable.  GLAZER-MOON advised MAZZA to file an EEOC complaint.

141.    On October 4, 2010, Relator MAZZA spoke with LLORT, the Assistant County Manager for THE COUNTY.  MAZZA informed LLORT of the gross and purposeful mismanagement of funds by MDT and its managers, supervisors and directors.  In response, LLORT referred MAZZA to Kathy Jackson, who was an auditor for THE COUNTY.  MAZZA provided Jackson with numerous documents evidencing the mismanagement of fare collections by MDT and its supervisors, directors and employees.  Nothing was done in response to these disclosures.

142.    On or about October 4, 2010, KAPOOR presented to MAZZA, for her signature, a Management Assertion Letter addressed to Yvette G. Taylor, FTA Regional Administrator, which letter asserted that MDT's financial management system had no "significant deficiencies or material weaknesses."  MAZZA refused to so assert and certify, knowing such certification and

37

assurance was false, as she had already found and reported countless material weaknesses and deficiencies in MDT's financial management system.   In light of her refusal to sign the Management Assertion Letter, KAPOOR signed that letter, and thereby falsely asserted to FTA that MDT's financial management system was adequate to meet criteria established by the FTA.

143.    Even as her efforts to assure MDT compliance failed internally, however, they were drawing the attention and approval of federal regulators.   More particularly, in 2009, not long after she came to work at MDT, MAZZA was sought out by an investigator from the federal OIG, Vivian Vega, who sensed that she would be a cooperating source for the ongoing civil and criminal investigations at MDT.   And she was.   Over many months, MAZZA delivered thousands of pages of documents to, and provided numerous interviews to, Ms. Vega.   Her work with federal officials was increasingly open and obvious to all, and it has continued from 2009 to the present.

144.    Eventually on October 17, 2010, MAZZA formally registered as a whistleblower with Miami-Dade County.   KAPOOR was immediately told about it and escalated his already unrelenting attack on MAZZA.   She responded by registering as a federal whistleblower on November 21, 2010.

145.    As time passed and KAPOOR found himself increasingly unable to stop MAZZA'S efforts and, unable to restrain himself, he started blaming all the problems at MDT on her.   Ultimately, he fired her in an effort to blunt the FTA, federal OIG, local OIG and FBI inquiries that were then ongoing.   Shortly before he fired her on November 23, 2010, he learned that she had formally registered as a whistleblower.   He fired her anyway, without explanation.

146.   Indeed, KAPOOR and CHEN lied to federal and Miami Dade authorities regarding who was responsible for revenue reporting, and falsely identified and blamed MAZZA for responsibilities that had been taken away from her.

147.   On or about December 7, 2010, BURGESS, LLORT, and KAPOOR appeared before the Board of County Commissioners and falsely stated that the suspension of FTA funds had resulted from accounting errors, that the responsible individual had been removed for not involving the County's staff in the audit, and that the FTA FMO auditors' preliminary findings could have been avoided, as no actual audit report has been provided.

148.   LLORT was the Assistant County Manager responsible for overseeing MDT.  Her contribution to this mess, upon observing an email string between MAZZA, KAPOOR and others about deficiencies at the department, was to suggest that they "stop airing dirty laundry". Unfortunately LLORT acquiesced in MAZZA's firing--apparently because of that misplaced "protect MDT at any costs" loyalty.  She did so – despite the following facts:

- LLORT was never consulted about MAZZA'S firing;

- LLORT knew MAZZA's last and only evaluation was excellent;

- LLORT was aware that Mazza had fixed one of the most egregious problems about which the FTA was by then complaining, that being the lack of a Force Account Plan related to preventive maintenance grants;

- LLORT also knew that MAZZA had complained that she had been asked to falsify records in advance of the FTA audit;

- LLORT knew that KAPOOR had created a situation where line functions did not have responsibility for outcomes, and authority and accountabilities were diluted; and

- As a result LLORT had lost confidence in KAPOOR, and knew he did not handle FTA issues effectively.

149.    Like all other MDT witnesses to date, LLORT also knew that most of the problems at MDT began in 2003 or earlier, long before MAZZA came on board at MDT, and that the major contributors to the failings at MDT and its trouble with the MDT were then incumbent department heads who were never taken to task.

150.    There are several communications from KAPOOR to LLORT, where he says that the problems at MDT began in 2003.  Later, KAPOOR writes to Kathy Jackson where he again rehashes the serious nature of the problem and then blames CHEN and asks who the compliance officers are.

151.    For years, MDT has been criticized by outside auditors for failing to comply with federal grant regulations, and thus putting at risk hundreds of millions of dollars.  Yet no one was ever held accountable.  That is consistent with the MDT tradition that no one is ever fired.

152.    Traditionally, even the worst miscreants were moved to another position where they could continue to be paid as employees or, in an extreme circumstance, given the option to "retire".  The incompetent KAPOOR was forced to, but at least allowed to, retire − and, in the process, was publicly praised for his years of service, though that service included the wholesale violation of federal laws, regulations, and grant requirements.

153.    MDT broke that tradition in firing Mazza.  There is great irony there, as well as great injustice, in the fact that the one person who could not be silenced, and who continued to work with the federal OIG, FTA and FBI to unearth the serial wrongdoing of KAPOOR and his MDT cronies, is the one person who suffered the nontraditional punishment: being fired.

402871v2

154.    In the wake of MAZZA'S whistleblowing and the related investigations, MDT has also been widely criticized in the press and by the federal government.  Indeed, high ranking Miami-Dade officials have commented directly on the failings at MDT.  As just one example, on May 13, 2011, Miami-Dade County Commissioner Vice Chairwoman Audrey M. Edmonson wrote an assistant county manager to criticize those who ran MDT and who now blamed MAZZA for their misdeeds.  In that letter, Commissioner Edmonson:

- Accused KAPOOR of an unparalleled level of financial mismanagement and misrepresentation; and

- Accused the County of either engaging in a cover up or relying on grossly misleading information from the senior management of MDT.

155.    To believe the story that MAZZA was fired, not in retaliation for whistleblowing, but for her failings as an employee, one must wonder why, when she crossed the threshold at MDT, she somehow left behind the work ethic and talent that had served her so well in the past.  The answer lies in the culture that existed and still exists at MDT, not in the alleged failings of this dedicated public servant.  She was a casualty of that culture.

156.    In the wake of her unlawful firing, and the assault on her reputation in Miami-Dade County, MAZZA and her family moved to Tallahassee.  The move was disruptive and costly, but her hope was that she would find less stress and better employment opportunities there.

157.    Nevertheless, MAZZA is not now employed, though she needs to work financially as well as emotionally.  Her employability has been dealt a death blow by her very public firing and the uniformly negative spin that Defendants publicly put on that firing.  Over 200 job applications have resulted in no offers, and the very substantial economic damages caused by her wrongful and retaliatory termination continue to mount.

158.    All of this has occurred as a result of a public servant doing what she truly believed to be the right thing – and not standing by while important federal laws and regulations were being serially violated.

## VI.    PLAINTIFF/RELATOR'S CAUSES OF ACTION.

### A.    COUNT I – FALSE CLAIMS ACT VIOLATIONS.

159.    Plaintiff/Relator MAZZA hereby incorporates and re-alleges the previous paragraphs as if fully set forth herein

160.    At all times material hereto, Defendant MDT was, and/or is, the agent and/or representative of THE COUNTY.

161.    By engaging in the actions, failures to act and schemes set forth above, Defendants, by and through their respective agents, officers, representatives and employees, violated the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, which states, in pertinent part:

> any person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B) . . . or (G); . . . or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000]… plus 3 times the amount of damages which the Government sustains because of the act of that person.

162.    The United States has been damaged as a result of Defendants' violations of the False Claims Act in an amount to be proven at trial.

163.    As direct consequence of the acts and violations described above, the United States is entitled to penalties and treble damages from Defendants based upon the damages sustained by reason of Defendants' acts and violations.

402871v2

B.      **COUNT II – FALSE CLAIMS ACT RETALIATION VIOLATIONS.**

164.    Plaintiff/Relator MAZZA hereby incorporates and re-alleges the previous paragraphs as if fully set forth herein.

165.    Plaintiff/Relator, MAZZA, was discriminated and conspired against, harassed, threatened, and ultimately discharged from her employment by Defendants, by and through the acts of Defendants' officers, agents, employees, and de facto employees, as a direct result of lawful actions taken by MAZZA in furtherance of an action, possible action, and/or investigation premised upon violations which might serve as the basis of an action under the False Claims Act.

166.    The lawful and legally-protected actions taken by MAZZA included, but were not limited to, her reporting of False Claims Act violations to the Office of Inspector General, her participation in the investigation of those violations by law enforcement officials, her investigation into those actions of the Defendants that are actionable under the False Claims Act, and her refusal to participate in a cover-up of the Defendants' violations of the False Claims Act.

167.    The actions of Defendants and/or their supervisors, managers, directors, and employees, as set forth above, violated 31 U.S.C. § 3730 (h) and caused damages to Plaintiff/Relator MAZZA.

168.    As alleged above, Defendants and others harassed MAZZA, in violation of 31 U.S.C. § 3730 (h) and/or assisted and/or conspired with Defendants, together with their supervisors, managers, directors and employees, to harass MAZZA in violation of 31 U.S.C. § 3730 (h).  As such, Defendants are subject to liability under that provision.

169.    As a result of these actions, MAZZA is entitled to the relief provided by 31 U.S.C. 3730 (h), including damages in an amount to be determined at trial, including attorney's fees and costs.

## VII.     PRAYER FOR RELIEF.

WHEREFORE, with respect to Count I, Plaintiff/Relator MAZZA, on behalf of herself and

the United States, requests a trial by jury and, after such trial, that this Court enter a judgment in

favor of MAZZA and the GOVERNMENT, and granting the following relief:

a) Judgment against each named Defendant in an amount equal to three times the amount of damages the United States has sustained because of its actions, plus a civil penalty of $5,500 to $11,000 for each violation of 31 U.S.C. § 3729, and the costs of this action, with interest including the costs of the United States for its expenses related to this action;

b) That Relator MAZZA be awarded all costs incurred, including reasonable attorneys' fees;

c) That Relator MAZZA be awarded 30%, but in no event less than 25%, of the proceeds of the resulting judgment in or settlement of this action;

d) That Relator MAZZA be awarded prejudgment interest; and

e) That the United States and Relator MAZZA receive all relief, both in law and equity as this Court determines is appropriate.

WHEREFORE, with respect to Count II, Plaintiff/Relator MAZZA, on behalf of herself,

requests that this Court enter a judgment awarding her:

a) all relief to which she is entitled pursuant to 31 U.S.C. § 3730(h), including personal injury damages for emotional and mental distress, two times her back pay, interest on all back pay as well as front pay or reinstatement, attorney's fees and litigation costs; and

b) such other and further relief as this Court finds appropriate.

402871v2

Dated: December 17, 2012

**THE JOSEPHS LAW FIRM**

By: _s/ Michael R. Josephs_
       Michael R. Josephs
       mrj@florida-attorneys.com
       Fla. Bar No. 119242
       Adam C. Josephs
       acj@florida-attorneys.com
       Fla. Bar No. 050895
       255 Alhambra Circle
       Suite 700
       Coral Gables, FL  33134
       305-445-3800
       305-448-5800 (Fax)

**DIAMOND MCCARTHY, LLP**
       James D. McCarthy
       *Pro hac vice application granted*
       jmccarthy@diamondmccarthy.com
       1201 Elm Street
       34th Floor
       Dallas, TX  75270
       214-389-5300
       214-389-5399 (Fax)

       Arley D. (Trip") Finley, III
       tfinley@diamondmccarthy.com
       *Pro hac vice application forthcoming*
       (512) 617-5200
       (512) 617-5299 (Fax)

       Robert Sadowski
       *Pro hac vice application granted*
       rsadowski@diamondmccarthy.com

       Raphael Katz
       *Pro hac vice application granted*
       rkatz@diamondmccarthy.com
       (212) 430-5400
       (212) 430-5499 (Fax)

       **ATTORNEYS FOR
       PLAINTIFF/RELATOR, MARJAN
       MAZZA**

402871v2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 17, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List below, in the manner specified, either via transmission of Notices of Electronics Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing electronically.


By: /s/ Michael R. Josephs
　　　Michael R. Josephs
　　　Fla. Bar No. 119242


## SERVICE LIST

Hugo Benitez
Assistant County Attorney
Oren Rosenthal
Assistant County Attorney
**MIAMI-DADE COUNTY ATTORNEY'S OFFICE**
Stephen P. Clark Center
111 N.W. 1st Street, Suite 2810
Miami, Florida  33128
Tel:  (305) 373-5151
Fax:  (305) 375-5634
Heb2@miamidade.gov
orosent@miamidade.gov

***COUNSEL FOR DEFENDANTS***

James A. Weinkle, Esq.
Assistant United States Attorney
Office of United States Attorney
99 N.E. 4th Street, Suite 300
Miami, Florida  33132
Tel:  (305) 961-9290
Fax:  (305) 530-7139
James.Weinkle@usdoj.gov
***COUNSEL FOR UNITED STATES***

Melissa Handrigan
Trial Attorney
U.S. Department of Justice, Civil Division
P.O. Box 261, Ben Franklin Station
Washington, DC  20044
Tel:  (202) 305-3083
Fax:  (202) 514-0280
Melissa.R.Handrigan@usdoj.gov

402871v2

**EXHIBITS A-Q TO PLAINTIFF'S
FIRST AMENDED COMPLAINT**

**THESE EXHIBITS WERE FILED IN THE CONVENTIONAL MANNER AS THEY
COULD NOT BE CONVERTED TO AN ELECTRONIC FORMAT**

402871v2